**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NICKEY CHEVROLET SALES, INC., Respondent.**

No. 72–1314.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 13, 1973.

Decided Feb. 27, 1974.

104

Marcel Mallet-Prevost, Asst. General Counsel, Paul J. Spielberg, Atty., N.L.R.B., Washington, D. C., for petitioner.

Ray E. Poplett, Chicago, Ill., for respondent.

Before FAIRCHILD and PELL, Circuit Judges, and CAMPBELL,* Senior District Judge.

FAIRCHILD, Circuit Judge.

The present proceeding arises out of a judgment of this court, entered March 11, 1971, finding respondent Nickey in civil contempt for disobeying a decree of this court entered May 4, 1965. Our 1965 decree enforced an N.L.R.B. order, and ordered respondent to cease and desist from discouraging union membership by discriminating in hiring, tenure or other conditions of employment or in-

---

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

terfering with its employees in the exercise of their right to self-organization.

Our 1971 judgment, entered after a proceeding initiated before us by the Board, found that respondent, by discharging its employee Sergott on October 4, 1969, wilfully violated the 1965 decree and became guilty of contempt of this court and its decree. We provided, among other things, that respondent shall purge itself of said contempt by reinstating Sergott "and making him whole for all pay and benefits lost due to the discrimination against him, together with 6% interest thereon. . . ." The discharge of Sergott was never the subject of an unfair labor practice proceeding before the Board.

Respondent reinstated Sergott March 24, 1971. Whether respondent then offered or tendered any amount of back pay is not clear, but in any event agreement on the amount necessary to comply with our 1971 judgment was not reached. The Board might then have asked this court to find that respondent had not purged itself so as to escape the penalties we prescribed in the event of respondent's default. Resolution of the dispute over the amount to be paid would then, either upon petition by the Board, or by respondent, perhaps accompanied by a tender, have been a function of this court, doubtless performed through a special master appointed by us.

The Board, however (and apparently at all times with the acquiescence of respondent), proceeded to make an administrative determination of the amount of back pay required. The regional director issued a back pay specification, respondent answered, a hearing was held before a trial examiner, General Counsel filed exceptions, the Board reversed the examiner in part, and issued an order, 195 NLRB No. 76, requiring respondent to pay Sergott $20,606.09, less tax withholding, and plus interest. The Board seeks enforcement of this order by a further decree of this court.

The procedural problem is that the foundation for a determination of the amount of back pay in Sergott's case is not a Board remedial order in a statutory unfair labor practice proceeding requiring respondent to reinstate Sergott and pay him back pay, but is an order of this court requiring respondent to do so in order to remedy an event which was never the subject of an unfair labor practice proceeding before the Board. As well be seen, we think there was no statutory authority for the back pay order entered by the Board, nor for the Board's petition to this court for enforcement of that order, and that any legal stature which the Board's back pay order has must be predicated upon the 1971 decree of this court, together with respondent's acquiescence in, and failure to object up to the time of oral argument before this court to the form of procedure followed.

After oral argument, the parties supplied supplemental memoranda. The Board argues that our 1971 judgment "tracks closely the language of a typical Board order of reinstatement and back pay, and appears to contemplate, if necessary, the usual back pay proceedings before the Board." In other words, it appears to be the Board's position that the similarity of the function of determining the amount of back pay in this case to the function regularly performed by the Board in other instances is to be given controlling significance.

It is true that the Board's authorization under 29 U.S.C. § 160(c) to "take . . . affirmative action including reinstatement of employees with or without back pay" has been construed to include the conduct of proceedings to determine the amount of back pay following court enforcement of a Board order directing payment of back pay in general terms. See Nathanson v. National Labor Relations Board, 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23, 30 (1952); National Labor Relations Board v. Bird Mach. Co., 174 F.2d 404, 405 (1st Cir., 1949); Wallace Corporation v. National Labor Relations Board, 159 F.2d 952, 954 (4th Cir., 1947); National Labor

Rel. Board v. New York Merchandise Co., 134 F.2d 949 (2d Cir., 1943).

It is the ordinary practice of the Board not to consider the amount of back pay until its general remedial order has been enforced by the court on its merits, in order to avoid unnecessary efforts if enforcement be denied. See N. L.R.B. v. Deena Artware, 361 U.S. 398, 411, 80 S.Ct. 441, 447–449, 4 L.Ed.2d 400, 409–410 (separate opinion) (1960); Nathanson, *supra*; New York Merchandise Co., *supra*. The Board has promulgated rules establishing the procedures for back pay proceedings subsequent to court enforcement of its orders. 29 C. F.R. § 101.16.

Courts have approved this procedure on the theory that the order of the Board requiring reinstatement and back pay clearly contemplates further administrative determination on its part; that the initial order is analgous to an interlocutory judgment fixing liability but not determining damages; and that the enforcement decree is analogous to an affirmance of such interlocutory judgment on appeal. After enforcement, the prior administrative proceedings resume and the exact amount of back pay due is determined.[1] If the supplemental Board order embodying this specific amount of back pay comes before the court again either for enforcement under § 10(e) or for review under § 10(f); an even more restricted judicial inquiry may be in order than is called for by the "substantial evidence test." In reviewing the Board's choice of a formula for computing back pay the Supreme Court has stated that the Board's order " 'should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' " [citations omitted] National L. R.B. v. Seven-up Bottling Co., 344 U.S. 344, 346–347, 73 S.Ct. 287, 289, 97 L. Ed. 377, 381–382 (1953).

■ The procedural stance of the instant case is quite different. Here, the Board did not commence another unfair labor practice predicated upon the discharge of Sergott, but chose, instead, to seek a judicial determination of the unlawfulness of his discharge in a contempt action.[2] In such an original proceeding before the court of appeals or its master, the Board must prove, much like a prosecutor in a criminal action, except by clear and convincing evidence, that the respondent has failed to comply with the decree of the court. See, e. g., N.L.R.B. v. Laney & Duke Storage Warehouse Co., 424 F.2d 109, 112 (5th Cir., 1970); Alamo Express, Inc., *supra*. In contrast, at an enforcement proceeding the Board defends its order as supported by the record made before the Board.

The Board relies on the procedure followed by this court in N.L.R.B. v. My Store, Inc., 468 F.2d 1146 (7th Cir., 1972), cert. denied 410 U.S. 910, 93 S.Ct. 965, 35 L.Ed.2d 271. There this court gave effect to the Board's back pay determination as an appropriate administrative proceeding within the Board's province. The Board had ordered reinstatement and back pay to a class of employees in an unfair labor practice proceeding; this court enforced; later this court found the employer in contempt for failure to make proper offers of reinstatement; after reinstatement, the court found the purgative terms of the contempt order had been satisfied, and remanded to the Board to determine back

1. Clearly it would be inappropriate for the court to usurp the Board's function at this stage by either hearing evidence or appointing a master to determine the specific amount of back pay due. See *New York Merchandise Co., supra.*

2. The Board has the responsibility of obtaining compliance with court decrees and may, when necessary, petition the court to hold a respondent in contempt. See, *e. g.*, NLRB v. Alamo Express, Inc., 395 F.2d 481 (5th

Cir., 1968); Olson Rug Company v. N.L.R. B., 304 F.2d 710 (7th Cir., 1962); 29 C.F. R. § 101.15, 29 U.S.C.A., p. 275. The purpose of providing an "immediately available" court decree via section 10(e) is to serve as a basis for contempt proceedings in the event of a subsequent renewal of the unfair labor practice. See National Labor Rel. Bd. v. Mexia Textile Mills, 339 U.S. 563, 569, 70 S.Ct. 826, 830, 94 L.Ed. 1067, 1073 (1950).

pay. Although the sequence of the proceedings is indeed similar to that in the instant case, we think there is a significant difference. In *My Store,* the back pay determination, although following a contempt adjudication, was a continuation of the original unfair labor practice proceeding, and a filling out of the Board's original remedial order.

■ Respondent's obligation to pay back pay to Sergott arose solely from the order of this court, and not from an order of the Board. If the Board, after an appropriate unfair labor practice proceeding, had ordered respondent to pay back pay to Sergott, the Board would, as held in the decisions above cited, have had authority to determine the amount in a further proceeding. Absent such underlying Board order, we think there was no authority for the Board's determination of the amount of back pay. The determination would be a nullity, and, unhappily, a waste of effort unless respondent's acquiescence makes possible a degree of salvage.

If the Board had been proceeding within its authority, the test on judicial review would be whether its findings were "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). Under the present circumstances, that test does not apply, because the statute did not confer the authority to make the determination, nor do we think that respondent's acquiescence could do so.

Respondent does, however, suggest in argument that the Board's determination could be treated as that of a special master and adopted by this court except where clearly erroneous.

It is, of course, improbable that we would have appointed the Board, or one of its examiners, our special master, in view of the Board's status as a litigant, albeit one not seeking the vindication of a private interest. The Board relies on the part of our contempt order requiring the "preserving [by respondent] and making available to the Board all records and books necessary to analyze the amount of backpay due, and to determine whether Sergott has been prop-erly reinstated." This language required disclosure of information to the Board, but could hardly imply an appointment of the Board as special master.

Nevertheless, in accord with the interest of judicial and administrative economy, we shall proceed, at least in approximation, to follow respondent's suggestion, and resolve the matter upon the record made, according no greater weight either to the decision of the examiner or of the Board than that to which findings of a special master would be entitled.

Sergott was discharged October 4, 1969 and reinstated March 24, 1971. The Board proposed a formula for determining his cash earnings during the interim: a percentage of the actual earnings during the interim of three other salesmen. The percentage was derived from a comparison over a previous 4¾ year period. There is no issue with respect to this formula. There is no evidence that he received other earnings during the interim. The examiner concluded, and the Board agreed, that Sergott's efforts to find other employment were reasonable from October 5, 1969 to April 30, 1970, while registered with and reporting to the state employment office. Respondent takes no issue with the decisions concerning this period.

The examiner concluded that Sergott's efforts after April 30, when he was no longer reporting to the employment office, could not be deemed reasonable. The Board reversed this part of the examiner's decision, on the basis that respondent had failed to sustain its burden of establishing that Sergott wilfully incurred a loss of earnings.

■■ The failure of a discriminatorily discharged employee to make a reasonable search for interim employment substantially equivalent to his prior position constitutes an affirmative defense to back pay liability; the burden of proof is on the employer. N.L.R.B. v. Madison Courier, Inc., 153 U.S.App.D.C. 232, 472 F.2d 1307, 1318 (1972); N.L.R.B. v. Reynolds, 399 F.2d 668, 669 (6th

Cir., 1968); N.L.R.B. v. Miami Coca-Cola Bottling Company, 360 F.2d 569, 575 (5th Cir., 1966); N.L.R.B. v. Brown & Root, Inc., 311 F.2d 447, 454 (8th Cir., 1963).

The fact which the employer must prove has been described by the Supreme Court as "losses which [the employee] willfully incurred" and "clearly unjustifiable refusal to take desirable new employment." Phelps Dodge Corp. v. National Labor Rel. Bd., 313 U.S. 177, 198, 200, 61 S.Ct. 845, 854, 85 L.Ed. 1271 (1941). Additional specifications have been widely accepted by the Board and Courts of Appeals: "fails diligently to search for alternative work", N.L.R.B. v. Mastro Plastics Corp., 354 F.2d 170, 174, n. 3 (2d Cir., 1965), cert. denied 384 U.S. 972, 86 S.Ct. 1862, 16 L. Ed.2d 682; "Failure . . . to make a reasonable search for interim work", N.L.R.B. v. Miami Coca-Cola Bottling Company, 360 F.2d 569, 575 (5th Cir., 1966); and failure to make an "honest good faith effort", N.L.R.B. v. Cashman Auto Co., 223 F.2d 832, 836 (1st Cir., 1955), followed in Golay & Co. v. N.L. R.B., 447 F.2d 290 (7th Cir., 1971).

The facts appearing in the record are as follows: At the time of discharge, Sergott was 44 years old and had been employed as a salesman by Chevrolet and Cadillac dealers for 18 years. Sergott registered with the state employment agency and reported 29 times up to April 30, 1970. Apparently these did not produce referrals. During the same period he called on 20 car dealers and made some 20 follow up telephone calls. After April 30 and before reinstatement, he made new contacts with four dealers and his total contacts with these dealers and some of those contacted earlier were 72, including a number of phone calls. Sergott testified he directed his later efforts toward those who initially encouraged him. He received no offers except from two dealers who conditioned further consideration on his resignation from the union.

The examiner did not discredit Sergott's testimony, only noting that in his judgment, "many of the contacts made by Sergott were window dressing."

Respondent proved only that there are more than five hundred new and used car dealers in the metropolitan area of Chicago. It offered no testimony as to business conditions during the period or other evidence tending to show that jobs were available for a salesman notwithstanding known union associations, or that the lack of opportunity with the dealers to whom Sergott applied was not representative. Sergott testified that "economically things were a bit slow at this time."

■ We think that the examiner, in ultimate effect, imposed on Sergott the burden of proving that his efforts were reasonable. Given the efforts Sergott was shown to have made, and in the absence of proof bearing at least generally on the availability of suitable employment in the area, we conclude the respondent did not discharge its burden of proof. Accordingly, we consider the examiner's adverse finding clearly erroneous, and find that Sergott's efforts were reasonable.

A second element of back pay was the value of the use of a demonstrator which would have been available to Sergott if employed by respondent. The examiner fixed a value per month, and the only challenge by respondent is that the Board has extended the figure over the whole interim.

A third element of back pay was the value of prizes in various sales contests sponsored by General Motors in which Sergott would have participated if employed.

Sergott testified without dispute that in the year preceding his discharge he received prizes worth $675. If that period were deemed representative of the interim, an allowance of $168.75 for each quarter would be appropriate. This was the figure used by the Board.

■ The examiner noted that when the General Counsel worked out a formula for cash earnings he had considered that a period of 4¾ years, or 19 quarters, should be used for comparison

of Sergott and the other salesmen. The examiner felt that a justification must be shown for selecting a different period as representative of prizes received. Since there was no evidence of the prizes received in any but the last year, the examiner pro rated the $675 over the 19 quarters, allowing $35.52 per quarter to compensate for loss of prizes.

Respondent offered no testimony to show that the one year period was not reasonably representative. Under these circumstances we consider the examiner's finding clearly erroneous and adopt the finding of the Board.

For reasons already indicated, we treat the Board's application for enforcement of its back pay order as a petition that we judicially determine the amount of back pay which respondent must pay Sergott in order to purge itself of contempt under our 1971 judgment. We adopt the findings of the Board as our own, consistently with the foregoing opinion.

Accordingly,

It is ordered and adjudged by the Court that within 20 days from the date this order is filed and entered, respondent shall pay to Harold Sergott, as the amount required under paragraph 2(b) of our judgment of March 11, 1971, $20,606.09, less any tax withholding required by the laws of the United States and the State of Illinois, plus interest thereon at the rate of 6 percent per annum in accordance with the formula prescribed in Isis Plumbing & Heating Co., 138 NLRB 716, and

It is further ordered and adjudged that in default of payment by such time, respondent shall be subject to the fine, and its officers and agents shall be subject to attachment, as provided in paragraph (1) of said judgment.

PELL, Circuit Judge (dissenting).

In my opinion, with regard to Sergott's back pay entitlement for the period subsequent to April 30, 1970, the trial examiner in a well reasoned and eminently fair opinion reached the only correct result. I therefore respectfully dissent.

Nickey Chevrolet is not a newcomer to the halls of this court. The present disposition marks the second time that a panel of this court had found clearly erroneous findings of fact made by a front line trier of fact following an evidentiary hearing. On the first occasion, the master, a United States district court judge, to whom this court referred the case found that there was no evidence that Sergott was discharged in retaliation for his union activities. The finding was held to be clearly erroneous. NLRB v. Nickey Chevrolet Sales, Inc., No. 15,122, 76 LRRM 2849 (1971).

The panel found Nickey Chevrolet in contempt and, *inter alia*, ordered that Sergott be offered full reinstatement (which was subsequently done) and that he be made whole for all pay and benefits lost due to the discrimination against him. 76 LRRM at 2852.

The case is now back with us again in the anomalous procedural posture which Judge Fairchild has carefully and, in my opinion, correctly analyzed. Again, however, this court has disagreed with the trier of fact, who had the opportunity to hear and evaluate witnesses, to the extent of holding his findings on the post-April 1970 period to be clearly erroneous.

I think it well at this point to look at the pertinent portion of the trial examiner's opinion:

"A different conclusion is warranted, however, with regard to Sergott's efforts to find employment after the expiration of his employment benefits on April 30, 1970. Those efforts cannot be deemed reasonable on the facts presented herein. After April 30, 1970, he kept applying to the same employers repeatedly although there is no indication he was receiving any encouragement. For example, between April 30, 1970, and March 17, 1971, he applied at (or telephoned) Stamer Cadillac, 11 times; Moell Cadillac, 11 times; Gateway Chevrolet, 11 times; Brigance Chevrolet, 11 times. These were all dealers to whom he had applied before April 30. Not until November 18, after a period of 6½

months, did he apply to a new dealer. Thereafter, he contacted another new dealer on January 4, 1971; another one on January 8, 1971; and yet another on March 12, 1971. There is no explanation why, having limited his search to 21 dealers over a period of 13 months, Sergott decided to expand his search, and yet to do so in such a limited fashion. In my judgment, many of the contacts made by Sergott were window dressing. An undetermined number were merely telephone calls, and as previously noted they were repeat calls. Given the size of the employment market, and the fact that he was no longer registered with the State Employment office, it cannot be said that such efforts to find equivalent employment were reasonable. Sergott is 44 years old with 18 years of experience. It is inconceivable to me that he would have been unemployed for 18 months had he made reasonable efforts to find equivalent employment. On the facts of this case, I conclude that Sergott is not entitled to backpay for the period after April 30, 1970."

Elsewhere in the decision it is pointed out that other than with regard to the dealers mentioned in the foregoing quoted portion, twenty-four in all, Sergott ignored the rest of some 500 Chicago area dealers through the entire back pay period, including a number of sizable dealers in the immediate area of his residence, that he discontinued reporting to the State Employment office as soon as his unemployment compensation benefits stopped, and that he did not contact a previous employer, Brigance Chevrolet, until nearly four months after his discharge.

Some of these additional matters just mentioned were, of course, not directly germane to the period subsequent to April 30, 1970. They are worthy of mention, however, in two respects. First, as I have mentioned, it appears to me that the trial examiner was eminently fair. Thus, he did not disqualify Sergott for an initial period even though Sergott waited four months to get in touch with Brigance. He was afforded similar favorable treatment notwithstanding that he did not apply to any employer until forty days after his termination. Second, it appears to me that the general attitude of Sergott reflected during the initial period serves as a background for evaluation of his efforts during the period here in question.

The standards for determining whether there is back pay entitlement are correctly outlined in the majority opinion. These synthesize into a requirement that the employee make an honest, good faith and reasonable effort to find other work. Despite what appears to me to be a complete lack of meeting these standards on the part of Sergott, the majority opinion overturns the finding of the trial examiner on the basis that the burden of proof on the company was not met.

Because of the rather unusual procedural aspect of the present case, arising as it does not from an unfair labor practice, a question might potentially exist as to who did have the burden of proof. However, noting statements such as "[t]he cases are unanimous that the defense of wilful loss of earnings is an affirmative defense, and that the burden is on the employer to prove the defense," NLRB v. Reynolds, 399 F.2d 668, 669 (6th Cir. 1968), I will assume that once the General Counsel had established the gross amount of back pay the burden was on Nickey. NLRB v. Madison Courier, Inc., 153 U.S.App.D.C. 232, 472 F.2d 1307, 1318 (1972). However, I do not conceive that this burden is to prove the lack of reasonable effort beyond a reasonable doubt but only by the greater weight of all of the credible evidence, considering the record as a whole. NLRB v. Madison Courier, Inc., *supra* at 1318. The burden, in any event, is only to show the lack of reasonable effort, not that a "discriminatee *would have* located suitable interim employment had he only made the required effort." *Id.* at 1319 (emphasis in the original).

It also appears to me that at some point in any fact finding process the burden is subject to being shifted and

that that should have been the case here. I am unable to say that a fact finding is clearly erroneous where it involves a man who only got in touch with twenty-four dealers out of some five hundred in the metropolitan area where he lived and then only sporadically, frequently by telephone, and many times where he had been turned down without any invitation to return. In other words, the company had met its burden of proof, and this proof was not overcome by any contrary evidence, at least, insofar as saying that it was clearly erroneous is concerned.

I do not agree with the majority's interpretation of the trial examiner's characterization of many of Sergott's contacts as "window dressing." The trial examiner had an opportunity to hear Sergott's testimony, and I read the characterization as a finding that Sergott was less than credible.

The Board in reversing did not do so on the basis of failure to meet the burden of proof but simply on a sweeping statement, which I find virtually unsupported other than by the Board's own assertion, that Sergott continued to make a reasonable search. The facts speak for themselves. The Board laid emphasis on (1) the fact that there was no evidence that Sergott at any time during the period received or refused any job offers; (2) that there was no showing that any jobs were available at any of the dealers to whom he applied or at any of the other Chicagoland dealers; and (3) that Sergott testified that he had not applied to the other dealers because he only applied to the dealers that gave him hope of getting a job.

Certainly, it appears to me, the lack of evidence that he was not offered a job bears only minimally on whether he used reasonable efforts; and the lack of evidence that he did not refuse one does not bear at all on the reasonableness-of-search question. I find incredible the thought that nearly half a thousand automobile dealers during nearly a year long period would not through normal processes of turnover, death, removals from the territory, promotions, and numerous other factors common to all businesses have had need for hiring experienced salesmen. I find equally incredible the necessity for showing by a widespread canvass this fact of everyday knowledge. Lastly, the hope that Sergott supposedly had when he made his repeat calls appears to be of gossamer quality and after several turn downs would not even seem to be of that magnitude.

Further, the majority opinion, as well as the Board, appears to rely on the fact that there may have been a lack of available suitable employment. In my opinion, this adds an improper element above and beyond the requirement that there be the good faith reasonable effort. Presumably there could be economic disaster areas where unemployment was so widespread that to attempt to seek a job would be obviously fruitless. I express no opinion as to whether even so there should not be some requirement of effort because that is not the case we have here. With a lack of diligence, " 'the circumstance of a scarcity of work and the possibility that none would have been found even with the use of diligence is irrelevant.' American Bottling Co., 116 N.L.R.B. 1303, 1307 (1956)," Madison Courier, Inc., *supra*, at 1319. (footnote omitted).

There is a basis for the belief that Nickey Chevrolet had assumed the status of *persona non grata* in the eyes of the Board by its long continuing appearances before the Labor Board and its representatives. That such status had been achieved, if it was, is no reason for reaching a different result than plainly indicated by the facts. I think the Board has done so in this case, whatever the motivating factors may have been, and I therefore in the particular procedural posture of this case would order payment by Nickey Chevrolet in accordance with the trial examiner's findings insofar as the period subsequent to April 30, 1970, is concerned. Otherwise, I concur in the opinion of the majority.